UNION PACIFIC RAILWAY COMPANY V. HATTIE V. CLARK, ADMINISTRATRIX.

FILED APRIL 21, 1897. No. 7145.

Death by Wrongful Act: EVIDENCE. Evidence examined, and *held* not sufficient to sustain a verdict that the death of plaintiff's intestate was caused by the negligence of defendant's servants.

ERROR from the district court of Buffalo county. Tried below before HOLCOMB, J. *Reversed.*

*J. M. Thurston, W. R. Kelly,* and *E. P. Smith,* for plaintiff in error.

*Green & Hostetler, contra.*

NORVAL, J.

This action was instituted in the court below by Hattie V. Clark, administratrix of the estate of John Clark, to recover damages by reason of the death of plaintiff's in-

testate, said to have been caused by the negligence of the defendant's servants while switching cars. From a judgment in favor of the plaintiff for $2,000 the defendant brings the case to this court for review by appropriate proceedings.

On and for a long time prior to the 27th day of April, 1892, John Clark was in the employ of the defendant as a section hand. In the afternoon of said day, while so engaged, he, together with George Keefover, Charles Coleman, and Frank Slamma, was directed by the foreman of the gang, Lawrence Brooks, to repair the roadbed upon the main line a short distance west of what is known as the "Cotton Mill Switch," at West Kearney, in Buffalo county, and the said Clark went to work in pursuance of said instructions less than 100 feet west of the switch stand. While thus engaged a freight train of the defendant, consisting of a locomotive and tender, two freight cars in front of the engine, and two in the rear, stood on the main track something like 400 feet east of said switch. Mr. Brooks, the foreman, observing the train, left the men, including Mr. Clark, who was standing in the center of the main track, and went to open the cotton mill switch, so as to place the cars thereon. Presently the servants of the company in charge of the train made what is called a "flying switch," which was done in the following manner, according to the testimony of Charles A. Coleman:

The engine was started with sufficient force with these cars in front of the engine, so as to throw them on the cotton mill switch by reason of their own momentum, after the engine was cut loose.

Q. What was done? Were they cut loose?

A. Those two cars were cut loose from the engine by reason of the steam being shut off, and the pin was drawn out and it was separated from the cars, and the engine then passed out of the way.

Q. What did the engine do with the cars that were behind it?

A. They went with the engine faster than the two cars that had been cut loose, and ran back upon the main line out of the way of the cars that were running by their own momentum, which ran onto the cotton mill switch, leaving space enough between the two cars for the switchman to throw the two cars onto the cotton mill switch.

Q. You say that the train started up at this depot and got under headway or speed enough, so that the cars in front of it ran onto this cotton mill switch?

A. Yes, sir.

Q. And then it was cut loose and it ran out of the way on the main track so that the switchman could turn the switch to throw the two cars onto the switch?

A. Yes, sir; that is correct.

It is disclosed that the front of the engine was to the east, and that in making the "flying switch," as above described, the engine and the two cars in the rear, after passing the switchstand, ran west upon the main line at a speed from twenty to thirty miles an hour, striking Mr. Clark, knocking him down, and injuring him so badly that he died in a few hours thereafter. The breach of duty claimed is that the defendant's employes were negligent in running the engine and cars at a high rate of speed, and in not ringing the bell and sounding the whistle, or giving any notice or signal of warning. The evidence is conflicting as to the speed of the engine and cars at the time of the accident, as well as whether any signals were given. The proofs for the company tended to show that the whistle was sounded before the engine started, and that the bell was rung continuously thereafter. Furthermore, that Mr. Brooks, by signalling with his hands, gave notice that a flying switch was about to be made. The testimony on behalf of the plaintiff below was sufficient to warrant the jury in finding that no signals of any kind were given. But there was, however, an entire failure of proof to establish that a flying switch could have been made at a less rate of speed, or that the failure to sound the bell or whistle, or the omission to sig-

nal the approach of the engine and cars, either or all com·
bined, occasioned Clark's death.    The cars were in plain
sight of the section hands at all times, and they knew that
the cars were about to be put upon the switch or side
track.    Had the deceased been looking eastward he
would have seen the cars in ample time to have escaped
danger.    No disinterested person can peruse this record
without reaching the conclusion that Mr. Clark's life was
lost through his own negligence in not looking out for
the cars and stepping off the track, as did the other men
in the gang who were nearer the switch than he.    The
case in most respects is like that of *Chicago, B. & Q. R.
Co. v. Soderberg*, 50 Neb., 674.    The evidence being insuf-
ficient to sustain the finding, the judgment is reversed
and the cause remanded for further proceedings.

REVERSED AND REMANDED.