EMMA GENS, Appellant, v. WAGNER ELECTRIC MANUFACTURING COMPANY and WAGNER ELECTRIC CORPORATION.—31 S. W. (2d) 785.

Division One, October 14, 1930.

504

*Jos. C. McAtee* and *Claude C. Findly* for appellant.

*A. E. L. Gardner* and *Charles A. Houts* for respondents.

506

ATWOOD, J.—Wagner Electric Manufacturing Company, a corporation, and Wagner Electric Corporation were sued by Emma Gens for damages in the sum of $36,577.94 on account of personal injuries alleged to have been sustained by her through their negligence. Defendants' answer was a general denial. At the close of plaintiff's case the court gave an instruction in the nature of a demurrer to the evidence. Plaintiff thereupon took an involuntary nonsuit with leave to move to set the same aside. Such a motion was filed and overruled, and plaintiff has perfected her appeal to this court.

Plaintiff's petition charged that on or about the 21st of March, 1922, she was employed in repairing and rewinding armatures for defendants, and while so employed at defendants' factory at her usual place of work and at the place provided by defendants for plaintiff and other employees to eat lunch and spend lunch time, and just prior to the blowing of a whistle calling plaintiff to resume her work, while sitting at her work bench and on the chair provided by defendants, the defendants "through and by Arthur Summerlad, a person employed at said time and for some time prior and subsequent thereto by defendants, in the same department and room as the plaintiff, caught hold of, shoved, pulled, jerked, hit and shook the chair in which plaintiff was sitting on, causing said chair to slide, topple and fall over and from under plaintiff, causing plaintiff to be precipitated and thrown violently to the floor of said room, by which she suffered and sustained injuries as hereinafter specified." The specifications of negligence were that "Summerlad was incompetent, negligently and habitually careless and continually guilty of horseplay and roughness in play towards the ones in contact with him in his work and in said room provided by defendants," and was

an improper and dangerous person to be placed in contact and association with other employees and particularly plaintiff, of which characteristics defendants knew or by the exercise of ordinary care could have known; that defendants ''failed and neglected to provide, formulate, publish and bring to the notice of their employees rules and regulations covering the conduct and behavior of employees towards one another at the place of eating and during the rest period provided by the said defendants to their employees, when by the exercise of ordinary care, such rules and regulations could have been provided, formulated, published and brought to the notice of their employees, and particularly to said Arthur Summerlad, in time to have prevented the accident complained of herein;'' that ''defendants were negligent, in that defendants furnished plaintiff with a chair or stool to sit upon which was a dangerous and unfit chair, in that said chair was a great deal higher than the average, usual and customary chair, with long, spindle narrow legs with a narrow span at the base, and was such a chair as was liable to topple or fall over when said chair was pulled, jerked or hit by anyone; that as a result thereof, when said chair was hit while plaintiff was sitting thereon, by said Arthur Summerlad, the same was caused to topple over and fall over and slide, thereby causing plaintiff to fall to the floor and causing her to be injured;'' that defendants required plaintiff to eat in the room where she was working, but failed to provide a safe and suitable place in which to spend her lunch time of thirty minutes ''in that the room where she was required to eat was a repair room in which oil and grease were used and the said oil and grease fell upon and was collected upon the floor, making the same slippery and unsafe and causing the portable chairs used by employees at lunch and work time to be liable to slip and topple over, and that as a result of said negligent failure of defendants to furnish plaintiff with a reasonably safe place in which to eat her dinner and spend her lunch time of thirty minutes, she was placed in a position of danger, and when said Arthur Summerlad caught hold of, shoved, pulled, jerked, hit and shook the chair on which she was sitting, the same was caused to slip and slide over, causing her to be precipitated to the floor and injured as hereinafter stated.'' The injuries alleged and proved were serious and probably permanent.

From plaintiff's evidence it appears that she was twenty-eight years old at the time this case was tried in June, 1927; that she had worked for the Wagner Electric Manufacturing Company for about six years prior to the accident, and had been engaged in stripping, rewinding and repairing armatures for about a year and a half; that she was the only girl engaged in winding and unwinding armatures; that the room in which she worked was about eighty by sixty feet,

and contained about one hundred and fifty employees; that her work required her to sit in front of a bench on a small iron chair the legs of which curved out at the bottom; that as she stripped pieces off the armature they fell on the floor leaving a dirty, greasy condition; that the floor was swept in the evening or before the next morning; that she and the other employees were required to eat their lunch in this work-room; that on the day of the accident she was sitting on this chair with her feet resting on a shelf between the chair and the floor; that she was through eating and was reading and was through with that because it was time to go to work; that "it was right near the whistle; near time to go to work." She testified: "I was sitting there with my feet almost even on the chair, about to turn around to go to work, and I felt something pull my—grab hold of my chair—the best I can remember it, grab hold of my chair; and that is all I remember of going down; it slid from the back of me. . . . It slid from under me; slid back. I went down in front of it. . . . I went down with my feet hanging in the shelf." She further testified that "maybe every other day once or twice, or once or twice a week" Summerlad would poke the girls in the side causing them to jump and scream loud enough to be heard over the room, and that these things had occurred while division superintendent Mayer and foremen Kritchell and Schnur were in the room.

An employee, Jacobs, testified: "About noon time I was on my way back to the department, about 12:29, just a minute or two before the whistle blew, and Miss Gens was sitting at her bench, having completed her lunch, sitting on this chair that she usually sat on; and the chair was tilted or pushed by Mr. Summerlad, and the chair slipped, and Miss Gens went down." He also testified that he had previously seen Summerlad poke female employees "with the index finger on their shoulders or ribs" until they would jump and scream loud enough to be heard five to ten feet, and that this had occurred a dozen times or so, sometimes when the foremen were in the room.

Another employee, Baird, testified as to the accident as follows: "I was standing about ten feet from her, looking directly at her. The whistle blew for—the factory whistle blew for the employees to resume work; and in the department is a horn, a Klaxon horn, or similar, that blows; and when that blowed, of course, all the employees in the department arose. There is quite a little hubbub then to resume their different places to go to work. Summerlad sprang upon the bench immediately behind Miss Gens, on his hands and knees, and reached over and took her chair and gave it two or three shakes (indicating) and let go of it; and the position that she was

sitting in, she just slid down off the front of the chair, the chair pushed back from her, and hit the floor.''

An employee named Welter, testifying as to Summerlad's conduct prior to the accident, said that he had seen him grab a girl right in the department during working hours and ''she hollered so loud you could hear her all over the floor.'' He said this occurred some times when foremen Kritchell and Schnur were in the room. He also testified that on the day Miss Gens was hurt ''the floor was dirty and greasy.''

Appellant insists that defendant's demurrer to the evidence should have been overruled, citing Obermeyer v. Logeman Chair Co., 229 Mo. 97, 129 S. W. 209. In that case the proof was that plaintiff, a fourteen-year-old boy, was employed on a freight elevator alleged to have been defectively constructed and maintained, in that two sides thereof were not protected with gates or guards, that between the sides so left open and the walls of the shaft was a space of several inches, and that from each floor there extended a strip or sill of wood several inches in width and reaching to the sides of the elevator so exposed. As the elevator ascended from the first floor another boy working with and standing in front of plaintiff stepped back on plaintiff's toes causing him to throw his foot back so that his heel was caught between the elevator and the projecting strip at the third floor and crushed. Plaintiff, in that case, was in no way responsible for the alleged defective condition of the elevator and the opinion comments upon the standard of care required of one of his tender years. In the instant case there was an absolute failure of proof that ''oil and grease were used and the said oil and grease was collected upon the floor,'' as alleged in the petition. The proof was that in stripping armatures plaintiff dropped strips on the floor leaving it in a dirty, greasy condition, but there is no evidence that even this condition, which plaintiff, a woman of mature years and experience, created and permitted to continue without complaint, in any way contributed to her injury. There is no showing that the tilted chair slid away from plaintiff because of the dirty and greasy condition of the floor or that it would not have done so if such condition had not existed. The proximate and sole cause of plaintiff's fall, as far as the record goes, was Summerlad's movement of the chair, which action was entirely outside the scope of his employment. The facts appearing in the respective cases easily differentiate them.

Appellant's second and third points proceed on the assumption that Summerlad's act was not the sole cause of the injury. The evidence, as already indicated, does not warrant this assumption and these points are without merit.

Appellant's fourth, fifth, sixth and seventh points are to the effect that repeated acts of negligence and habitual carelessness are evidence of negligence, that when a coemployee of known dangerous character is retained the injured employee should recover, and that knowledge of careless habits are to be imputed to defendants. Assuming without holding that these propositions as stated are sound, yet they are without application, because it plainly appears from the evidence that the act of Summerlad which caused plaintiff's injury was entirely outside of the nature and scope of his employment. The authorities cited are cases where those who caused the injuries were acting within the scope and course of the master's employment.

In stating their eighth point counsel for appellant say: "Even if it appears that the unlawful act of the employee was in no proper sense incident to the servant's employment, yet the plaintiff is entitled to recover if there was a ratification by the master." There is no evidence that Summerlad ever before pulled, tilted or shook the chair in which another employee was seated, or that the particular act here complained of was done with the knowledge or in the presence of any of his superiors, or that defendants ever ratified his act.

Appellant finally urges that "the relationship and consequent duty continued during the noon hour," citing Ellsworth v. Metheney, 104 Fed. 119, 51 L. R. A. 389. In that case it was held that the proprietor of a coal mine, who places a dangerous electric wire along a passageway which the miners are accustomed to use during the noon hour with the knowledge of and without objection by the proprietor, is charged with the duty to properly guard and protect the wire or give notice of the danger. The bare statement of this holding shows its inapplicability to the facts in the instant case.

The apparent seriousness of plaintiff's injuries has impelled us to examine this record with more than ordinary care. However, the doctrine that is clearly applicable and decisive of the case is thus stated in 39 Corpus Juris, page 546 (n. 68): "The master is not liable for an injury occasioned by sportive acts or horseplay not in the scope and course of the employment."

The judgment is affirmed. All concur.